IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:11-CV-193-D

| | |
|---|---|
| WILLIAM L. THORPE REVOCABLE TRUST, and PATRICIA WEBSTER, individually and as trustee, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )     **ORDER** |
| | ) |
| AMERITAS INVESTMENT CORPORATION, UNIFI MUTUAL HOLDING COMPANY, AMERITAS HOLDING COMPANY, AMERITAS LIFE INSURANCE CORPORATION, and STEWART S. KING, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

In 2008, Stewart S. King ("King") was a chartered life underwriter and financial consultant, and a representative of Ameritas Life Insurance Corporation's ("ALIC") investment products. See Am. Compl. [D.E. 19] ¶¶ 7, 11–12. In June 2008, King was introduced to Patricia B. Webster ("Webster"). Id. ¶ 11. At the time, Webster was sixty-one years old and was the trustee of the William L. Thorp Revocable Trust ("Thorp Trust"). Id. ¶¶ 2, 13. King told Webster that he was a representative for ALIC and its affiliated companies. See id. ¶ 14. ALIC is a subsidiary of Ameritas Holding Company ("AHC"), which in turn is a subsidiary of UNIFI Mutual Holding Company ("UNIFI"). Id. ¶¶ 4–5. Ameritas Investment Corporation ("AIC") is the principal underwriter of ALIC's policies. Id. ¶ 3. The ALIC entities are collectively referred to as "the companies."

At King's behest, Webster and the Thorp Trust invested with the companies. The investments, however, declined in value, and plaintiffs sued the companies and King. Defendants

now ask the court to dismiss plaintiffs' amended complaint for failure to state a claim upon which relief can be granted. As explained below, the court grants in part and denies in part the motion to dismiss.

I.

During 2008, King and Webster met several times, and King discussed his access to various investments, his experience at providing financial advice, and the strength of ALIC's products. See id. ¶¶ 15–16. King made several representations to Webster about himself and ALIC's products, including that: (1) over the course of his career, King had obtained annual returns that exceeded twelve-to-fifteen percent for himself and his clients, id. ¶ 17; (2) Webster could withdraw a significant percentage of her funds each year without penalty, and that the penalties would decrease by one-percent per year over nine years, id. ¶ 19; and (3) Webster was guaranteed a five-percent annual return on her investments, id. ¶ 20. See id. ¶ 24. Webster informed King that, due to her age, she was interested in, among other things, generating income, minimizing tax exposure, accessing her funds when necessary, and increasing the value of the Thorp Trust for its beneficiaries. See id. ¶¶ 21, 57. King assured Webster that she would be unrestricted in transferring funds between a money market account and three stock market accounts, and that he would monitor her investments and instruct her when to move funds to maximize her returns. Id. ¶¶ 22–23; see id. ¶ 24. King knew that Webster had invested with traditional brokers, that she had no formal training or background in finance, and that she relied on professional financial advice. Id. ¶¶ 25, 52.

After stating that he had reviewed Webster's finances, King told Webster to transfer all of her liquid assets into four separate ALIC annuities, or else he would not provide investment advice to her. See id. ¶¶ 16, 18, 24; see also ¶ 54. Webster was unfamiliar with annuities, but King stated that the annuities were "perfect" for her because of the five-percent guaranteed returns and the tax

2

benefits. Id. ¶¶ 26, 33, 54. On November 11, 2008, based on King's advice, Webster purchased four ALIC annuities with a total value of over $1,563,000. Id. ¶¶ 27, 29–30. As a result, Webster liquidated a $150,000 position in gold investments and transferred the funds to ALIC annuities. See id. ¶ 18. For each annuity, the Thorp Trust was named the owner with Webster being the annuitant. Id. ¶ 28. King received around $100,000 in fees for the sale of the annuities, and Webster pays annual fees of approximately $11,000. Id. ¶ 31. Webster received the annuities' prospectus and promotional materials after her purchase. Id. ¶ 32.

King informed Webster that he initially would deposit her funds in a money market account and that he would instruct her on when to move the funds into the stock market accounts. Id. ¶¶ 34–35. Months later, Webster received her first statement and discovered that her funds were already in the stock market accounts. Id. ¶ 36. She immediately questioned King, who informed her that he had "checked the wrong box on the application." Id. However, King never returned Webster's funds to a money market account, and by March 2009, Webster had lost fifteen percent of her original investment. Id. ¶ 37.

Webster's investments continued to decline in value, but King insisted that she not move her funds. Id. ¶ 39. He repeatedly reassured her that she had the five-percent guaranteed return as a "safety net." Id. ¶¶ 39–40. When the Dow Jones Industrial Average was near a low of approximately 7200 points, King instructed Webster to move her funds back into a money market account. Id. ¶ 41. Webster followed King's advice and then, as instructed, waited for King's signal to return the money to the stock market accounts. Id. ¶ 42. Afterward, Webster repeatedly tried to contact King with no success. Id. ¶ 43.

In March 2010, Webster contacted ALIC directly. Id. During the call, Webster learned that the five-percent guaranteed return was not in effect for her annuities. Id. Later, she also learned that

her withdrawal penalties did not decrease by one-percent per year, and that she cannot invest in individual assets, only selected stock market accounts. Id. ¶ 44. Webster then sought to confirm this new information with King. Id. ¶ 45. King generally did not respond to Webster's calls and emails. See id. ¶ 45. However, in one instance when King provided information, he reassured Webster that the ALIC representative to whom she spoke was misinformed, and he would have ALIC send a letter to Webster confirming the five-percent guaranteed return. Id. ¶ 46. Webster never received this letter. Id. In October 2010, King stopped responding to Webster. Id. ¶ 47.

On October 6, 2010, Webster sent a letter to Eric Hall of ALIC, discussing her concerns. Id. ¶ 48. After several weeks with no response, Webster called ALIC again and spoke with a representative who told her that ALIC would mail her a reply the next day. Id. ¶ 49. Webster never received a reply. Id. In April 2011, Webster learned that King was no longer affiliated with ALIC. Id. ¶ 50. King, however, remains listed as Webster's ALIC representative. Id. ¶¶ 51, 62.

On November 10, 2011, Webster and the Thorp Trust filed this action in the Eastern District of North Carolina against the companies and King (collectively, "defendants") [D.E. 1]. On December 9, 2011, plaintiffs filed an amended complaint. See Am. Compl. In their amended complaint, plaintiffs assert twelve claims against the defendants: (1) a violation of Rule 10b-5 of the Securities Exchange Act of 1934, see 17 C.F.R. § 240.10b-5; (2) a violation of the North Carolina Securities Act, see N.C. Gen. Stat. § 78A-8; (3) a violation of the North Carolina Investment Advisers Act, see N.C. Gen. Stat. § 78C-8; (4) a violation of the Investment Advisors Act of 1940, see 15 U.S.C. § 80b-6; (5) a violation of Chapter 58 of North Carolina's General Statutes, see N.C. Gen. Stat. § 58-60-170; (6) breach of an implied covenant of good faith and fair dealing; (7) breach of fiduciary duty; (8) fraud; (9) fraud in the inducement; (10) negligence; (11) liability for negligence based on respondeat superior; and (12) negligent infliction of emotional

4

distress. See Am. Compl. ¶¶ 64–157. On January 11, 2012, defendants moved to dismiss plaintiffs' amended complaint [D.E. 22], and filed a memorandum in support [D.E. 23]. On March 12, 2012, plaintiffs responded in opposition [D.E. 29], and on March 28, 2012, defendants replied [D.E. 30].

II.

In analyzing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted," a court must determine whether the complaint is legally and factually sufficient. Fed. R. Civ. P. 12(b)(6); see Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007); Coleman v. Md. Ct. App., 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S. Ct. 1327 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). A court need not accept a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009); see Iqbal, 556 U.S. at 678–79. Similarly, a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79.

In addition, "when a defendant attaches a document to its motion to dismiss, a court may consider it in determining whether to dismiss the complaint if it was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity." Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004) (quotation and alterations omitted); see Braun v. Maynard, 652 F.3d 557, 559 n.1 (4th Cir. 2011); accord Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). Here, defendants attached four documents to their memorandum in support of their motion to dismiss: (1) annuity disclosure forms that Webster allegedly signed [D.E. 23-1]; (2) model asset allocation agreements that Webster allegedly signed [D.E. 23-2]; (3) new account forms that Webster allegedly signed [D.E. 23-3]; and (4) a client

5

disclosure booklet [D.E. 23-4]. Plaintiffs' amended complaint, however, does not explicitly rely upon these documents, and the documents are not integral to any of plaintiffs' claims. Accordingly, at this stage of the litigation, the court does not consider these documents. See Braun, 652 F.3d at 559 n.1 ("We do not consider the report here because it was not explicitly relied upon in the complaint . . . ."); cf. Am. Chiropractic Ass'n, 367 F.3d at 233–34 (considering attached document when the complaint explicitly identified the document as containing the alleged misrepresentation).

A.

Plaintiffs first two claims accuse defendants of committing securities fraud under both federal law, 17 C.F.R. § 240.10b-5, and North Carolina law, N.C. Gen. Stat. § 78A-8. See Am. Compl. ¶¶ 64–81. In construing section 78A-8, the court must, absent "definitive authority from North Carolina's highest court, attempt to divine what that court would do were it faced with this [case]." Teague v. Bakker, 35 F.3d 978, 991 (4th Cir. 1994). In doing so, the court may consider cases from the North Carolina Court of Appeals, treatises, and the practices of other states. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). Section 78A-8 "closely parallels the Rule 10b-5 antifraud provision of the Securities Exchange Act." State v. Davidson, 131 N.C. App. 276, 282, 506 S.E.2d 743, 748 (1998); see Teague, 35 F.3d at 991; compare 17 C.F.R. § 240.10b-5, with N.C. Gen. Stat. § 78A-8. Accordingly, the court construes section 78A-8 in accordance with the construction of Rule 10b-5. See Teague, 35 F.3d at 991; Davidson, 131 N.C. App. at 282–83, 506 S.E.2d at 748; cf. Skinner v. E.F. Hutton & Co., Inc., 314 N.C. 267, 275, 333 S.E.2d 236, 241 (1985) (relying on Fourth Circuit precedent as guidance for construing a state law that was "identical" to a federal statute).

To prevail on their securities-fraud claims, plaintiffs must show: (1) a material misrepresentation or omission by defendants, (2) made with scienter, (3) in connection with the

6

purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. See Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011); Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005). Defendants challenge plaintiffs' securities-fraud claims on four grounds.

First, defendants contend that because securities fraud applies only to statements made "in connection with the purchase or sale of a security," defendants are not liable for King's representations made after Webster purchased the annuities. See Mem. Supp. Mot. 10. The court agrees. See, e.g., Flickinger v. Harold C. Brown & Co., Inc., 947 F.2d 595, 598 (2d Cir. 1991); In re Vivendi Universal, S.A. Sec. Litig., No. 02 Civ. 5571(RJH), 03 Civ. 2175(RJH), 2004 WL 876050, at *4 (S.D.N.Y. Apr. 22, 2004) (unpublished); accord SEC v. Pirate Investor LLC, 580 F.3d 233, 244–45 (4th Cir. 2009) (per curiam). Accordingly, based on plaintiffs' amended complaint, defendants can be held liable only for securities fraud based on King's representations that (1) the annuities would have a five-percent guaranteed return, (2) the withdrawal penalty would be reduced over time, and (3) King would advise Webster on her investments. See Am. Compl. ¶¶ 19–20, 22–24. Plaintiffs' amended complaint fails to allege that King's other representations were made in connection with Webster's purchase of the annuities.

Second, defendants argue that plaintiffs fail to state a claim based on King's representation about the withdrawal penalties because plaintiffs do not allege that this representation caused an economic loss. See Mem. Supp. Mot. 12–14. In support, defendants note that plaintiffs must allege "a causal connection between the material misrepresentation and the loss." Dura Pharm., 544 U.S. at 342; see Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 185–86 (4th Cir. 2007).

Here, plaintiffs do not allege that they were penalized for withdrawing funds, or that they avoided withdrawing funds out of fear of being penalized. Rather, plaintiffs allege a single economic loss—diminution in the value of the investments, see Am. Compl. ¶ 41—but fail to

7

plausibly allege facts sufficient to infer that King's representations about the withdrawal penalties relate to this loss. See Dura. Pharm., 544 U.S. at 346–47; Hunter, 477 F.3d at 186–87. Accordingly, plaintiffs fail to state a securities-fraud claim based on King's alleged representation about the withdrawal penalties.

Third, defendants argue that plaintiffs do not plausibly allege scienter. To plausibly allege a claim under Rule 10b-5, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see, e.g., Tellabs, Inc., 551 U.S. at 313–14; Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 306 (4th Cir. 2009); Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 623 (4th Cir. 2008). To prove a defendant acted with scienter, a plaintiff must show "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc., 551 U.S. at 319 (quotation omitted); see Siracusano, 131 S. Ct. at 1323. A plaintiff may plead the requisite scienter by alleging either intentional misconduct or recklessness. Ottmann v. Hanger Orthopedic Grp., Inc., 353 F.3d 338, 343–44 (4th Cir. 2003); see Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 181 (4th Cir. 2009); Pub. Emps.' Ret., 551 F.3d at 313; Cozzarelli, 549 F.3d at 623. A strong inference of scienter exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc., 551 U.S. at 324; see Merck & Co., Inc. v. Reynolds, 130 S. Ct. 1784, 1796 (2010); Pub. Emps.' Ret., 551 F.3d at 306; Cozzarelli, 549 F.3d at 624. However, a plaintiff need not make a "smoking-gun" allegation to create a strong inference of scienter. Tellabs, Inc., 551 U.S. at 324. Rather, the court will look at the totality of the facts alleged in the complaint. See id. at 326; Cozzarelli, 549 F.3d at 625.

8

Looking at the totality of the facts alleged in the amended complaint, plaintiffs' complaint gives rise to a strong inference that King intentionally or recklessly misrepresented the five-percent guaranteed return. First, plaintiffs' plausibly allege that defendants had a pecuniary motive to induce Webster to purchase the annuities. See Am. Compl. ¶ 31; see also Tellabs, Inc., 551 U.S. at 325 (holding that motive, though not dispositive, is "a relevant consideration" that "may weigh heavily in favor of a scienter inference"). Second, King knew that Webster wanted to generate an annual income while protecting her assets. See Am. Compl. ¶ 21. Third, King was aware of Webster's age and that she was an unsophisticated investor who relied on his financial advice. See id. ¶ 57. Fourth, King pressured Webster into moving all of her assets into ALIC annuities. See id. ¶ 24. Fifth, King was evasive when Webster tried to question him about his representations. See id. ¶¶ 45–47. Finally, plaintiffs allege that King's representations about the guaranteed returns were false. See id. ¶¶ 43–44. Although every false statement does not necessarily demonstrate scienter, "certain statements are such that, to show them false is normally to show scienter as well." Merck, 130 S. Ct. at 1796. For instance, it is unlikely that King would state that an ALIC annuity has a five-percent guaranteed return "without being aware of the fact that his statement was false." Id. at 1797. Thus, the totality of the facts alleged in the amended complaint plausibly suggest that King intentionally, or at least recklessly, misrepresented the annuities' guaranteed returns. See, e.g., Tellabs, Inc., 551 U.S. at 324. Accordingly, plaintiffs allege facts that support a strong inference that King acted with the requisite scienter when he misrepresented the annuities' guaranteed returns.[1]

---

[1] Congress introduced the requirement of a "strong inference" in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Pub. L. No. 104-67, § 101, 109 Stat. 737 (codified at 15 U.S.C. § 78u-4(b)); see Tellabs, Inc., 551 U.S. at 313–14. This court need not decide whether the Supreme Court of North Carolina would adopt the PSLRA's heightened pleading standards for state securities-fraud litigation. Even if the Supreme Court of North Carolina would not adopt the PSLRA's heightened requirements, plaintiffs' section 78A-8 claim passes muster.

In contrast, plaintiffs have failed to plausibly allege facts supporting the inference that King acted with the required scienter when he promised to provide investment advice to Webster. King's unfulfilled promise does not, in itself, suggest scienter. Cf. Merck, 130 S. Ct. at 1797; see also Poth v. Russey, 99 F. App'x 446, 454 (4th Cir. 2004) (per curiam) (unpublished). In order to show that a promise was made with the requisite scienter, a plaintiff must plausibly allege that the defendant intended not to perform the promise when he made it. See, e.g., Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000); U.S. Quest Ltd. v. Kimmons, 228 F.3d 399, 407 (5th Cir. 2000). Plaintiffs makes no such allegation against King regarding his promise to provide investment advice.

Next, defendants argue that Webster cannot claim she was defrauded because defendants had warned her of the risks that eventually caused her economic losses. See Mem. Supp. Mot. 15. In support, defendants cite Gasner v. Bd. of Supervisors, 103 F.3d 351 (4th Cir. 1996), and argue that plaintiffs cannot claim that their losses were the result of securities fraud when "the total mix of the information made available [to the plaintiffs] warned them of the high risks they were facing, [but they] nonetheless chose to purchase these [investments]." Id. at 360. To show that defendants warned Webster of the risks, defendants rely solely on the documents attached to their memorandum—documents that the court declines to consider. Thus, at this stage of the litigation, defendants' argument fails.

Finally, defendants assert a separate challenge to plaintiffs' North Carolina securities-law claim. Defendants argue that plaintiffs fail to plausibly allege a claim under N.C. Gen. Stat. § 78A-8 because plaintiffs fail to allege that Webster "did not know, and in the exercise of reasonable care, could not have known of the untruth" of King's representations. Mem. Supp. Mot. 17 (quoting Bob Timberlake Collection, Inc. v. Edwards, 176 N.C. App. 33, 41, 626 S.E.2d 315, 322 (2006)). In Bob Timberlake, the North Carolina Court of Appeals construed specific language in section 78A-

10

56(a)(2). See 176 N.C. App. at 40-41, 626 S.E.2d at 322 ("who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission" (quoting N.C. Gen. Stat. § 78A-56(a)(2))). The quoted language, however, is not found in section 78A-8; therefore, Bob Timberlake does not help defendants.

In sum, plaintiffs plausibly allege that defendants violated Rule 10b-5 and section 78A-8 by representing to Webster that the ALIC annuities would have guaranteed annual returns of five percent. However, plaintiffs' complaint fails to state a securities-fraud claim beyond this single alleged misrepresentation. Accordingly, the court grants in part and denies in part defendants' motion to dismiss claims one and two.[2]

B.

Plaintiffs' third claim alleges that defendants fraudulently solicited Webster as an investment advisee and thereby violated N.C. Gen. Stat. §§ 78C-8(a)(1)-(2) and (b). See Am. Compl. ¶¶ 82-91. Defendants argue that plaintiffs fail to plausibly allege that Webster did not know, or could not have discovered, the falsity of King's representations. See Mem. Supp. Mot. 18 (citing Bob Timberlake, 176 N.C. App. at 41, 626 S.E.2d at 322). However, as explained, Bob Timberlake does not apply to a claim under section 78C-8. Thus, the court denies defendants' motion to dismiss claim three.

C.

Plaintiffs' fourth claim alleges that defendants violated section 206 of the Investment Advisers Act ("IAA"), 15 U.S.C. § 80b-6. See Am. Compl. ¶¶ 92-98. Defendants argue, without elaboration, that the court should dismiss plaintiffs' IAA claim for the same reasons it should dismiss

---

[2] Section 20(a) of the Securities Exchange Act imposes joint and several liability on a person who "controls any person liable under any provision of this chapter." 15 U.S.C. § 78t(a); see Matrix Capital, 576 F.3d at 192; Hunter, 477 F.3d at 168. Plaintiffs plausibly allege that the companies are liable for King's representations under section 78t(a).

11

plaintiffs' Rule 10b-5 claim. See Mem. Supp. Mot. 19. In addition, defendants ask the court to dismiss the IAA claim because plaintiffs fail to state with particularity the circumstances constituting the scheme to defraud. See id.; Fed. R. Civ. P. 9(b).

Defendants' reasons for dismissing the Rule 10b-5 claim do not apply to plaintiffs' IAA claim. To state a claim under section 80b-6, plaintiffs must allege that "defendant[s were] investment advisor[s], that [they] engaged in fraudulent activities, and that [they] negligently breached [their] fiduciary duty by making false and misleading statements or omissions of material fact." SEC v. Gotchey, 981 F.2d 1251, 1992 WL 385284, at *2 (4th Cir. 1992) (per curiam) (unpublished table decision); see SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 192–95 (1963); Morris v. Wachovia Sec., Inc., 277 F. Supp. 2d 622, 644 (E.D. Va. 2003), aff'd in part and vacated on other grounds, 448 F.3d 268 (4th Cir. 2006). Plaintiffs' allegations are sufficient. Thus, the court rejects defendants' Rule 10b-5 argument.

As for defendants' Rule 9(b) argument, "it is not clear that Rule 9(b) applies in this case because the claim arises under [section 206 of the IAA], a provision that is not appropriately characterized as an anti-fraud provision." Morris, 277 F. Supp. 2d at 645. Moreover, assuming without deciding that Rule 9(b) applies to the section 206 claim, plaintiffs have satisfied Rule 9(b)'s requirements. See United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008); Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999); Morris, 277 F. Supp. 2d at 645; cf. Am. Compl. ¶¶ 19–20, 26–27, 54, 92–98. Thus, the court denies defendants' motion to dismiss claim four.

D.

In claim five, plaintiffs allege that defendants recommended an annuity that they knew was unsuitable for Webster and, more generally, failed to supervise their product recommendations, in

12

violation of N.C. Gen. Stat. § 58-60-170. See Am. Compl. ¶¶ 99–108. A violation of section 58-60-170 "is an unfair method of competition and unfair and deceptive act or practice in the business of insurance in violation of [N.C. Gen. Stat.] 58-63-10." N.C. Gen. Stat. § 58-60-175(c). In claim five, plaintiffs attempt to bring a private cause of action under section 58-63-10 to obtain relief for defendants' alleged violation of section 58-60-170. See Am. Compl. ¶¶ 106–07. Defendants respond that section 58-63-10 does not provide a private cause of action, and that plaintiffs instead must bring their claim under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1. See Mem. Supp. Mot. 19–20.

Although Chapter 58 of North Carolina's General Statutes prohibits unfair and deceptive practices by insurance companies, only North Carolina's Insurance Commissioner may directly enforce the provisions of Chapter 58. See Martini v. Companion Prop. & Cas. Ins. Co., 198 N.C. App. 39, 46, 679 S.E.2d 156, 160–61 (2009), rev'd on other grounds, 364 N.C. 234, 695 S.E.2d 101 (2010) (per curiam); see also N.C. Gen. Stat. §§ 58-63-20, -25, -32, -40 (granting the Insurance Commissioner the authority to investigate and enforce provisions); cf. Defeat The Beat, Inc. v. Underwriters At Lloyd's London, 194 N.C. App. 108, 116, 669 S.E.2d 48, 53 (2008) (private remedy for violation of N.C. Gen. Stat § 58-63-15 is UDTPA claim); Nelson v. Hartford Underwriters Ins. Co., 177 N.C. App. 595, 608–09, 630 S.E.2d 221, 231 (2006) (same). A plaintiff's remedy for a violation of Chapter 58 is to file a UDTPA claim. See Martini, 198 N.C. App. at 46–47, 679 S.E.2d at 160–61; Defeat The Beat, 194 N.C. App. at 116, 669 S.E.2d at 53; Nelson, 177 N.C. App. at 608–09, 630 S.E.2d at 231. To state a claim under the UDTPA, a plaintiff must show (1) an unfair or deceptive act or practice (2) in or affecting commerce (3) which proximately caused injury to the plaintiff or to the plaintiff's business. See N.C. Gen. Stat. § 75-1.1; Defeat The Beat, 194 N.C. App. at 116, 669 S.E.2d at 53; Nelson, 177 N.C. App. at 609, 630 S.E.2d at 231. In analyzing a UDTPA

claim, a court may look to the prohibitions of Chapter 58 "for examples of conduct which would constitute an unfair and deceptive act or practice." Defeat The Beat, 194 N.C. App. at 116, 669 S.E.2d at 53–54.

Plaintiffs' amended complaint does not include a UDTPA claim. Rather, plaintiffs rely on section 58-63-10 for a private cause of action, which Chapter 58 does not authorize. Accordingly, plaintiffs have failed to state a claim, and the court grants defendants' motion to dismiss claim five.

E.

In claim six, plaintiffs allege that defendants breached an implied covenant of good faith and fair dealing. See Am. Compl. ¶¶ 109–12. Defendants argue that plaintiffs' implied-covenant claim fails to identify a contractual duty to accompany an implied covenant of good faith and fair dealing. See Mem. Supp. Mot. 20–21 (citing Hardee's Food Sys., Inc. v. Beardmore, No. 5:96–CV–508–BR(2), 1997 WL 33825259, at *2 (E.D.N.C. June 6, 1997)).

In the amended complaint, plaintiffs do not identify the alleged contract between plaintiffs and defendants, much less identify the specific contractual terms to which an implied covenant of good faith and fair dealing would attach. Accordingly, the court grants defendants' motion to dismiss claim six.

F.

In claim seven, plaintiffs allege that defendants breached a fiduciary duty to Webster. See Am. Compl. ¶¶ 113–117. In response, defendants argue that the economic loss rule bars the claim. See Mem. Supp. Mot. 22–24. North Carolina courts have applied the economic loss rule to prohibit recovery for purely economic loss in tort when a contract or warranty has already allocated the risk. See, e.g., Kelly v. Georgia-Pacific LLC, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009); N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978), rejected in part

14

on other grounds by Trs. of Rowan Technical Coll. v. J. Hyatt Hammond Assocs., Inc., 313 N.C. 230, 328 S.E.2d 274 (1985); Land v. Tall House Bldg. Co., 165 N.C. App. 880, 882–85, 602 S.E.2d 1, 3–4 (2004). Defendants assert that "[p]laintiffs have alleged the existence of a contractual relationship between the parties," and defendants ask the court to read the model asset allocation agreements as having allocated the risk to plaintiffs. See Mem. Supp. Mot. 22; see also [D.E. 23-2].

In the amended complaint, plaintiffs do not identify a specific contractual relationship between the parties (beyond the annuities). Moreover, the court will not consider the model asset allocation agreements in ruling on the motion to dismiss because the model asset allocation agreements were not integral to and explicitly relied on in the amended complaint. See Braun, 652 F.3d at 559 n.1. Thus, based on the present record, the court denies defendants' motion to dismiss claim seven.

G.

Plaintiffs' eighth and ninth claims accuse defendants of committing fraud (claim eight) and fraud in the inducement (claim nine). See Am. Compl. ¶¶ 118–34. Defendants contend that the court should dismiss these claims because plaintiffs fail to plausibly allege intent to deceive and reasonable reliance. See Mem. Supp. Mot. 24–25.

In North Carolina, to prove either fraud or fraud in the inducement, a plaintiff must establish "(1) [f]alse representation or concealment of a past or existing material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Whisnant v. Carolina Farm Credit, 204 N.C. App. 84, 94–95, 693 S.E.2d 149, 156–57 (2010) (quotations omitted); compare Phelps-Dickson Builders, LLC v. Amerimann Partners, 172 N.C. App. 427, 437, 617 S.E.2d 664, 670 (2005) (fraud), with Harton v. Harton, 81 N.C. App. 295, 298–99, 344 S.E.2d 117, 119–120 (1986) (fraud in the inducement). In

addition, the injured party's reliance must be reasonable. See Hudson-Cole Dev. Corp. v. Beemer, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999); Rosenthal v. Perkins, 42 N.C. App. 449, 451–52, 257 S.E.2d 63, 65 (1979).

First, defendants argue that the court should dismiss the fraud claims because plaintiffs fail to plausibly allege that defendants intended to deceive Webster. See Mem. Supp. Mot. 24–25. Intent to deceive requires that the defendant have "both knowledge and an intent to deceive, manipulate or defraud." Malone v. Topsail Area Jaycees, Inc., 113 N.C. App. 498, 502–03, 439 S.E.2d 192, 195 (1994) (emphasis and quotation omitted); see RD & J Props. v. Lauralea-Dilton Enters., LLC, 165 N.C. App. 737, 745, 600 S.E.2d 492, 498 (2004). Mere reckless indifference to the truth is insufficient to satisfy this element. Malone, 113 N.C. App. at 502, 439 S.E.2d at 194. Here, plaintiffs plausibly allege that defendants knew King's representations concerning the annuities were false and intended to deceive Webster. See Am. Compl. ¶¶ 120–21, 128–29. In addition, plaintiffs plausibly allege sufficient facts to infer that King intended to deceive Webster with his misrepresentations about the annuities' guaranteed returns. See Phelps-Dickson, 172 N.C. App. at 437, 617 S.E.2d at 670. Thus, this argument fails.

Second, defendants argue that plaintiffs fail to plausibly allege that Webster reasonably relied on King's representations. Under North Carolina law, a plaintiff is unreasonable in relying on a defendant's misrepresentation when the plaintiff "could have discovered the truth upon inquiry." Hudson-Cole, 132 N.C. App. at 346, 511 S.E.2d at 313; see Rosenthal, 42 N.C. App. at 452, 257 S.E.2d at 66. Thus, when the allegations in a plaintiff's complaint show that the plaintiff could have inquired into the truth of the representation, the plaintiff must make the additional allegation "that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." Hudson-Cole, 132 N.C. App. at 346, 511 S.E.2d at

16

313; see Rosenthal, 42 N.C. App. at 452, 257 S.E.2d at 66. Most commonly, this requirement bars claims where a plaintiff unreasonably relied on representations concerning real property. See, e.g., Barfield v. Matos, 714 S.E.2d 812, 824–26 (N.C. Ct. App. 2011) (restrictive covenants); Hudson-Cole, 132 N.C. App. at 346–47, 511 S.E.2d at 313 (deed of trust); Rosenthal, 42 N.C. App. at 452, 257 S.E.2d at 66 (property's risk of flooding). However, the North Carolina Court of Appeals has applied this requirement to representations about insurance policies, see Cobb v. Pa. Life Ins. Co., 715 S.E.2d 541, 549–50 (N.C. Ct. App. 2011); Pinney v. State Farm Mut. Ins. Co., 146 N.C. App. 248, 256, 552 S.E.2d 186, 192 (2001), and bank accounts. See Kucmierz v. Four Oaks Bank & Trust Co., 202 N.C. App. 148, 690 S.E.2d 559, 2010 WL 157550, at *3 (2010) (unpublished table decision).

Here, plaintiffs plausibly allege that Webster was unable to learn the truth by exercising reasonable diligence. Whether plaintiffs can prove this allegation is an issue for another day. Accordingly, the court denies defendants' motion to dismiss claims eight and nine.

H.

In claim ten, plaintiffs accuse King of being negligent in his role as a financial advisor to Webster, and accuse ALIC of being negligent in supervising King and responding to Webster's inquires. See Am. Compl. ¶¶ 135–44. In claim eleven, plaintiffs accuse the companies of being liable for King's negligence based on respondeat superior. See id. ¶¶ 145–51. Defendants respond that the economic loss rule bars plaintiffs' negligence claims. See Mem. Supp. Mot. 26. The economic loss rule prohibits recovery for purely economic loss in tort when a contract has allocated the risk. See, e.g., Kelly, 671 F. Supp. 2d at 791; N.C. State Ports Auth., 294 N.C. at 81, 240 S.E.2d at 350; Land, 165 N.C. App. at 882–85, 602 S.E.2d at 3–4. On the present record, defendants have failed to identify a contract that allocates the risk between the parties. Accordingly, the court denies

17

defendants' motion to dismiss claims ten and eleven.

I.

In claim twelve, Webster alleges that defendants' negligent conduct caused her severe emotional distress. See Am. Compl. ¶¶ 152–57. To prevail on a claim of negligent infliction of emotional distress, a plaintiff must show: (1) the defendant engaged in negligent conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress; and (3) the defendant's conduct, in fact, caused the plaintiff severe emotional distress. E.g., Sorrells v. M.Y.B. Hospitality Ventures of Asheville, 334 N.C. 669, 672, 435 S.E.2d 320, 321–22 (1993); Gardner v. Gardner, 334 N.C. 662, 665–66, 435 S.E.2d 324, 327 (1993). Defendants seek dismissal of this claim because (among other things) Webster fails to allege sufficient facts to infer that defendants reasonably could have foreseen that their conduct would cause severe emotional distress to Webster. See Mem. Supp. Mot. 26–27.

"Although the question of foreseeability is generally for the jury, the trial judge is required to dismiss the claim as a matter of law upon a determination that the injury is too remote." Wrenn v. Byrd, 120 N.C. App. 761, 765, 464 S.E.2d 89, 92 (1995); see Sorrells, 334 N.C. at 674, 435 S.E.2d at 323. A court should examine the chain of alleged events connecting the defendant's negligent conduct to the plaintiff's severe emotional distress, and dismiss the claim if "the initial and final events . . . are not so proximately related that the result could have been foreseeable to the [defendant]." Robblee v. Budd Servs., Inc., 136 N.C. App. 793, 796, 525 S.E.2d 847, 850 (2000); see Sorrell, 334 N.C. at 674, 435 S.E.2d at 323. Moreover, "a plaintiff must allege and prove that *severe* emotional distress was a foreseeable and proximate result of the negligence; mere temporary fright, disappointment or regret will not suffice." Gardner, 334 N.C. at 667, 435 S.E.2d at 328 (quotation and alternations omitted); see Sorrells, 334 N.C. at 672, 435 S.E.2d at 322.

18

In Sorrells, parents sued a bar owner for negligent infliction of emotional distress because their son died in an accident after he was negligently served alcohol at the bar. See 334 N.C. at 671, 435 S.E.2d at 321. The Supreme Court of North Carolina "conclude[d] as a matter of law that the possibility (1) the defendant's negligence in serving alcohol to [the son] (2) would combine with [the son's] driving while intoxicated (3) to result in a fatal accident (4) which would in turn cause [the son's] parents (if he had any) not only to become distraught, but also to suffer severe emotional distress . . . , simply was a possibility too remote to permit a finding that it was reasonably foreseeable." Id. at 674, 435 S.E.2d at 323 (emphasis and internal quotation marks omitted). In Robblee, an employee sued a security company for negligent infliction of emotional distress because a former disgruntled employee returned to the employee's workplace and killed and wounded several employees. See 136 N.C. App. at 793–94, 525 S.E.2d at 848. The North Carolina Court of Appeals held that "[t]he possibility that (1) [the] defendant's negligence in failing to retrieve the temporary access card (2) would combine with [the killer's] rage against his former employer (3) to result in a workplace shooting (4) which would cause [the plaintiff] to suffer emotional distress" was "too remote to permit a finding that it was reasonably foreseeable." Id. at 797, 525 S.E.2d at 850 (quotation omitted).

Here, assuming Webster adequately alleges defendants' negligence and Webster's severe emotional distress, the complaint still fails to provide facts sufficient to infer that defendants would have foreseen King's conduct resulting in Webster's severe emotional distress. The possibility that (1) King's negligence (2) would combine with the credit crisis of 2008 and (3) Webster's refusal to control her funds herself (4) to result in deep stock losses (5) which would cause Webster not just emotional distress, but severe emotional distress, is "too remote to permit a finding that it was reasonably foreseeable." Sorrells, 334 N.C. at 674, 435 S.E.2d at 323; Robblee, 136 N.C. App. at

19

797, 525 S.E.2d at 850 (quotation omitted). Because Webster fails to plausibly allege that Webster's severe emotional distress was reasonably foreseeable, the court grants defendants' motion to dismiss claim twelve.

III.

The court GRANTS in part and DENIES in part defendants' motion to dismiss [D.E. 22]. The court DISMISSES in part claims one and two, and DISMISSES claims five, six, and twelve. Plaintiffs may proceed with claims one and two, only to the extent the claims rely on King's representation about the annuities' guaranteed returns, and claims three, four, seven, eight, nine, ten, and eleven.

SO ORDERED. This 19 day of September 2012.

JAMES C. DEVER III
Chief United States District Judge