## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION
## No. 4:11-CV-193-D

| | |
|---|---|
| WILLIAM L. THORP REVOCABLE ) | |
| TRUST, and PATRICIA B. WEBSTER, ) | |
| individually and as trustee, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| AMERITAS INVESTMENT CORPORATION, ) | |
| UNIFI MUTUAL HOLDING COMPANY, ) | |
| AMERITAS HOLDING COMPANY, ) | |
| AMERITAS LIFE INSURANCE ) | |
| CORPORATION, and STEWART S. KING, ) | |
| ) | |
| Defendants. ) | |

On November 10, 2011, Patricia B. Webster ("Webster") and the William L. Thorp

Revocable Trust ("Trust") (collectively, "plaintiffs") sued Ameritas Investment Corporation ("AIC"),

Unifi Mutual Holding Company ("UNIFI"), Ameritas Holding Company ("AHC"), Ameritas Life

Insurance Corporation ("ALIC"), and Stewart S. King ("King") (collectively, "defendants"). See

Compl. [D.E. 1] ¶¶ 1–7. On December 9, 2011, plaintiffs filed a verified amended complaint with

twelve claims. See Am. Compl. [D.E. 19] ¶¶ 64–157. On September 19, 2012, this court dismissed

three claims completely and two claims in part, allowing plaintiffs to proceed with nine claims. See

[D.E. 31] 20.

On February 3, 2014, defendants moved for summary judgment on the remaining claims

[D.E. 51]. Plaintiffs responded in opposition [D.E. 59], and defendants replied [D.E. 63]. As

explained below, the court grants defendants' motion for summary judgment [D.E. 51], grants

defendants' motion to strike plaintiffs' errata sheet [D.E. 60], and dismisses as moot plaintiffs' and

defendants' motions to strike expert testimony and defendants' motion to compel [D.E. 64, 66, 74].

I.

Webster and King met in June 2008. King Dep. [D.E. 59-2, 63-6] 166. King was an independent life insurance and annuities sales agent for AIC, where he started working in 2005. Id. at 90–91; Sherffius Dep. [D.E. 59-11] 83. King had not sold annuities before 2005. King Dep. 91–92. In June 2008, King held the Series 6 and 63 licenses but did not have a Series 7 license. Id. at 18. When Webster and King first met, Webster and the Trust each held investments with a managed account at Fidelity. Webster Dep. [D.E. 51-16, 59-3, 63-1] 29. Webster had lost between $600,000 and $800,000 in 2008 with her Fidelity account and was looking to invest elsewhere. Id. at 22–23. Mutual friends of Webster and King suggested to Webster that she meet with King. Id. at 72.

At their initial meeting, Webster told King about the recent decrease in the balance in her Fidelity account. King Dep. 169. King told Webster that he had a track record of earning annual returns of 10% to 12% for his clients, that he could help her "stop the bleeding," and that he had products with investment floors to "make sure that there was no lessening of the investment." Id. at 168–69; see also Webster Dep. 89. King explained one such product as a "variable annuity" with "a guaranteed floor as an option, which would prevent [one's] amounts to be reduced." Id. at 169–70. Webster also asserts that King described one particular annuity as having a "guaranteed five percent yield." Webster Dep. 88.

Sometime after the initial June meeting between King and Webster, Webster called her CPA, Jane Huband, and her tax attorney, Thomas Wilson, to arrange a meeting with all four of them. See Webster Dep. 117, 173; Wilson Dep. [D.E. 59-16] 20; Huband Dep. [D.E. 51-13, 59-9] 109; see also [D.E. 51-1] Ameritas 5; [D.E. 51-2] Ameritas 170–71. Webster told Huband and Wilson that she would "welcome [their] opinions" on King and his products. Webster Dep. 131.

2

On September 8, 2008, Webster emailed King in preparation for this upcoming meeting. Webster referenced King's "plan for [Webster's] portfolio, including . . . the guaranteed 5% yield." [D.E. 59-4] PW 614. King's reply, one day later, did not mention the 5% yield. See id. PW 615.

On September 10, 2008, Webster and King met with Huband and Wilson. See [D.E. 51-1] Ameritas 33–34. According to Huband's notes from the meeting, Webster was considering using King as "her 'investment' person," but King discussed life insurance and annuities rather than investment products. [D.E. 51-1] Ameritas 33–34. Shortly after the meeting, King sent Huband and Wilson documents explaining the annuities. See [D.E. 51-1] Ameritas 5, 64–161; [D.E. 51-2] Ameritas 193–279; Webster Dep. 179–80; Huband Dep. 101–02. The documents included information on the Guaranteed Lifetime Withdrawal Benefit ("GLWB"), an optional rider on an ALIC variable annuity. See [D.E. 51-1] Ameritas 144–52; [D.E. 51-2] Ameritas 252–61. These documents describe the GLWB rider as an option that creates a shadow account used for determining the annuitant's lifetime withdrawal benefit. See [D.E. 51-1] Ameritas 144–52. This shadow account assumes a 5% increase in the market value of the investment regardless of the actual change in value, and the annuitant receives the greater of the two values when withdrawal benefits are calculated. Id. The annuitant must activate and pay for the GLWB rider to receive these benefits and, in September 2008, the rider's annual cost was 0.60% of the investment value. Id. The documents also contain a notice that the rider does not apply "to the investment performance or account value of the underlying variable portfolios" and that "[v]ariable annuities are suitable for long-term investing and are subject to investment risk, including possible loss of principal." Id. Ameritas 152.

Defendants claim that Huband and Webster discussed Huband's analysis of the documents King provided. See Huband Dep. 100; [D.E. 51-1] Ameritas 30 (noting the "[g]uaranteed life income options" as a benefit of the annuity). Webster, however, testified that neither Huband nor

3

Wilson ever explained to her how the GLWB rider worked. See Webster Dep. 195.

On September 21, 2008, King provided Webster, Huband, and Wilson with the contact information of two other Ameritas employees who could have explained the annuities to her in full. See [D.E. 51-14] PW 636. The record does not reflect that any of the three ever called.

On October 1, 2008, in anticipation of a second meeting, Webster sent another email to King in which she asked King to explain "if we go with the annuity alone, why I will be better than with Fidelity (eg. 5% guaranteed, no withdrawal penalty, tax advantages, etc.)." See [D.E. 59-5] Ameritas 627. On October 2, 2008, the parties met again. See [D.E. 51-2] Ameritas 280. At the meeting, the parties discussed the annuities, although Webster and defendants present different views of that discussion. Webster testified that King "opened [a] brochure from Ameritas [and] talked about the guaranteed five percent." Webster Dep. 258. She further testified that "the part I remember is guaranteed five percent yield," id. at 189, and that the GLWB rider was not discussed at the meeting. Id. at 189–90. Webster also testified that underlining in the GLWB brochure from the meeting was King's, not Wilson's. Id. at 190; see [D.E. 51-2] Ameritas 252–61. Webster claimed that there was no discussion of the guaranteed 5% yield being a rider or an option, or that the rider required activation and carried a fee. Webster Dep. 190–91. Huband testified that she did not recall discussing the GLWB rider, its benefits, or its details, and that she had no experience with guaranteed lifetime withdrawal benefits. Id. at 109, 111.

King, on the other hand, testified that he never told Webster she was guaranteed a 5% return on her investment, and that Webster never told him she understood the annuities to include such a guarantee. King Dep. 198. King also acknowledged, however, that he "probably" explained that the GLWB rider "allowed you to have a five percent growth . . . or the market, whichever is . . . greater for that year. And if the market reduced below where it entered . . . your funds would stay

4

at that level. They wouldn't follow the market down." Id. at 132, 171.

Webster testified that her two "experts," Wilson and Huband, gave conflicting advice regarding the annuities: Wilson approved purchasing the annuities, but Huband was concerned about the transaction. Webster Dep. 276; Huband Dep. 102. Both Huband and Wilson suggested that Webster consider options other than King's offered products. Webster Dep. 231.

On October 15, 2008, Webster opened four AIC accounts, three on her behalf and one, acting as trustee, on behalf of the Trust. See [D.E. 51-5] Ameritas 1700–01, 1734–35, 1766–67, 3546–47. Contemporaneously, she purchased four ALIC variable annuities with initial investments of $60,819.50, $313,939.60, $500,000.00, and $688,932.84. See [D.E. 51-8] Ameritas 2845–50; Am. Compl. ¶¶ 29–30. King completed the forms on Webster's behalf, but Webster reviewed the forms, signed them, and checked a box stating that no one except her would have trading authority. King Dep. 293–95; [D.E. 51-8] Ameritas 2848; see Webster Dep. 306–07. The forms stated that Webster had a "high risk" tolerance and that her top two investment objectives were "tax-advantaged" and "aggressive growth" and the lowest was "income." See, e.g., [D.E. 51-5] Ameritas 1700–01.[1] Furthermore, the GLWB rider was marked as "Inactive Phase," although Webster purchased a guaranteed death benefit. See [D.E. 51-8] Ameritas 2846. The annuity application also stated that 100% of the investment would go into a money-market portfolio. See [D.E. 51-8] Ameritas 2847. However, because King "checked the wrong box," the money went into an aggressive fund in October 2008. See [D.E. 51-15] PW 802–03.

Webster and King communicated throughout 2009. In January 2009, Webster learned that

---

[1] Plaintiffs and defendants dispute Webster's true risk tolerance. In addition to the new account forms, defendants cite two 2008 communications in which Webster wrote that she was "non-risk-adversive" and "not risk-aversive." See [D.E. 51-14] PW 627; [D.E. 51-10] Ameritas 3928–29. Webster testified that the first of these was a joke and that she is risk averse. Webster Dep. 63.

5

her funds were mistakenly put into an aggressive fund, but she also learned that the portfolios had grown by 12%. See [D.E. 51-15] PW 802–03. Webster kept the money in the aggressive funds. See id.; Carter Dep. [D.E. 63-11] 190–91; [D.E. 51-7] Ameritas 2624. On March 9, 2009, Webster emailed King and said, "I'm thinking that I want out now." See [D.E. 51-14] PW 744. Four days later King responded and said, "I will be transferring into the ameritas money market on Monday, march 16." See [D.E. 59-19] PW 745. Webster then moved her money from the aggressive fund to a money market account. Webster Dep. 376. On April 10, 2009, Webster emailed King and asked "why we haven't jumped back in since parking the portfolio in cash at around the 7300 level?" See [D.E. 51-4] Ameritas 673. King wrote to Webster on April 20, 2009, and advised her to reenter the aggressive fund in May 2009. See [D.E. 63-15] Ameritas 674; cf. Webster Dep. 364. Webster understood his emails as suggestions that she could choose to follow. Webster Dep. 365. Webster, however, retained control over all her accounts. Id. at 360. According to Webster, she did not get back into the aggressive fund because King did not tell her to "pull the trigger," and her money remained in the money market account through 2010. Id. at 391–92. Throughout 2009, Webster and King continued to meet periodically. Id. at 392.

On October 13, 2009, Ameritas sent a letter to Webster informing her that the GLWB rider was and had been inactive on her account since the policy was issued. See [D.E. 51-7] Ameritas 1820. Webster acknowledged receiving documents stating that the GLWB rider was inactive. Webster Dep. 334. Webster also stated that she had received documents with a UNIFI coversheet but did not read them because she "thought [she] had [her] money somewhere safe, and [she] didn't want to read anything." Id. at 350.

In March or April 2010, Webster called Ameritas and spoke with Eric Hall, an Ameritas client service representative. See [D.E. 59-13] Ameritas 2667; [D.E. 51-15] PW 801; Fine Dep.

6

[D.E. 59-12] 83. Among other questions, Webster asked if the policy was guaranteed to earn 5% each year. See [D.E. 59-13] Ameritas 2667. Hall did some research and called Webster back and explained that the GLWB rider was on the policy but currently inactive. Id. Webster asked further questions about the GLWB rider. Id. Webster claims that she did not know about the GLWB rider until she talked with Ameritas directly in 2010. Webster Dep. 191. Webster also asked Hall for additional information on her policy fees, and Hall called her back the next day to answer. See [D.E. 59-13] Ameritas 2667. Webster told Hall she would speak with her agent and call back if she had further questions. Id.

Between April 27, 2010, and July 27, 2010, Webster and King exchanged numerous emails. See [D.E. 63-4] Ameritas 1637–58. In an email dated May 25, 2010, Webster referenced a prior conversation and stated that King had told her that Ameritas's agents had given her inaccurate information about the annuity. See [D.E. 63-5] Ameritas 1651. King replied that "the annuity is as I said." Id. Webster composed a letter to King on July 28, 2010, in which she stated that she "had a misunderstanding, based on [her] conversations with [King], about the terms of the 'base plus 5%' part of the annuity." See [D.E. 51-15] PW 801–04.

On July 13, 2011, Webster's attorney, Thomas Wilson, contacted Ameritas requesting additional information and informing them to place a litigation hold on relevant materials. See [D.E. 51-2] Ameritas 189–92. Communication between Wilson and Ameritas continued until plaintiffs filed suit on November 10, 2011. Id. Ameritas 173–88; Compl. [D.E. 1].

II.

Before addressing defendants' motion for summary judgment, the court considers defendants' motion to strike plaintiffs' errata sheet concerning Webster's deposition [D.E. 60]. Defendants moved to strike based on the numerous material changes to Webster's deposition testimony

7

contained in her errata sheet. See id.

Rule 30(e) permits a deponent "(A) to review the transcript; and (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e)(1)(A)–(B). The Fourth Circuit has not construed Rule 30(e)(1)(B). This court concludes, however, that Rule 30(e)(1)(B) does not permit a party to make changes that substantively contradict or modify sworn deposition. See, e.g., E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 277 F.R.D. 286, 297–98 (E.D. Va. 2011) (restricting Rule 30(e) changes to demonstrated court reporter errors); Blundell v. Wake Forest Univ. Baptist Med. Ctr., 1:03CV998, 2006 WL 694630, at *3–4 (M.D.N.C. Mar. 15, 2006) (unpublished) (granting motion to strike errata sheet for, among other reasons, material alterations made to the deposition testimony); cf. Barwick v. Celotex, 736 F.2d 946, 959–60 (4th Cir. 1984) (affirming district court's rejection of an affidavit that contradicted the same witness's sworn deposition testimony). "A deposition is not a take home examination." Greenway v. Int'l Paper Co., 144 F.R.D. 322, 325 (W.D. La. 1992).

The court has reviewed plaintiffs' original errata sheet containing 38 changes, see [D.E. 60-1], and the revised errata sheet containing 19 changes. See [D.E. 68-1]. Both errata sheets contain significant, material changes that modify and contradict Webster's original testimony regarding material issues in the litigation, including Webster's understanding of the annuity that she purchased and of the GLWB rider. For example, one of Webster's changes would alter her deposition testimony to state "[T]hat's how I understand [King's] investment proposal" instead of "[T]hat's how I understand the GLWB." See [D.E. 60-1] 6; [D.E. 60-2] 11. Plaintiffs' reason for the change is that it is "[m]ore accurate. I never heard [King] talk about GLWB." See [D.E. 60-1] 6. Accuracy aside, the change fundamentally alters and contradicts Webster's sworn deposition testimony about how she understood the GLWB rider, a key issue in many of plaintiffs' claims. Another change

8

would alter Webster's original response to the question "did you purchase the five percent guaranteed lifetime benefit rider?" from "I did." to "I did not. I had never heard of a guaranteed lifetime benefit rider. As King represented this plan to me, I thought I had a guaranteed 5% yield on the Plan from the time I transferred my money over. No rider was mentioned." See [D.E. 68-1] Ex. A, at 4. Although Webster later corrected herself in the original deposition, the proposed change adds significant factual testimony tailored to bolster plaintiffs' case. The errata sheets contain other similar, material changes.

In opposing the motion to strike, plaintiffs cite DeLoach v. Philip Morris Companies, Inc., 206 F.R.D. 568, 573 (M.D.N.C. 2002), for the proposition that substantive changes are permitted under Rule 30(e)(1)(B). See Resp. Opp'n Mot. Strike [D.E. 68] 2. In DeLoach, the district court denied defendants' challenge to an errata sheet, holding that the "Defendants' reading of Rule 30(e) as only allowing the correction of court reporter typographical errors is too narrow, given the plain language of the rule, case law, and the nature of Plaintiff's changes." DeLoach, 206 F.R.D. at 573 (emphasis added). In DeLoach, however, the district court found that the amended testimony did not contradict the deposition answers or "add new facts to support asserted claims." Id. at 572. Thus, DeLoach is distinguishable. Moreover, the court rejects plaintiffs' interpretation of the phrase "form or substance" in Rule 30(e)(1)(B). A change in "form" would include correcting a typographical error or a spelling error. A change in "substance" would include the substantive correction of a court reporter's transcription (i.e., the witness answers "No," but the court reporter records "Yes"). Accordingly, the court grants defendants' motion to strike plaintiffs' errata sheet [D.E. 60], but declines to award costs or fees.

### III.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine

dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of showing an absence of genuine dispute of material facts or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If a moving party meets its burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). There is a genuine issue for trial if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." Id. at 252; see also Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law properly preclude summary judgment. Anderson, 477 U.S. at 248. In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. Matsushita, 475 U.S. at 587–88.

## IV.

### A.

Before addressing plaintiffs' individual claims, the court considers defendants' argument that defendants UNIFI and AHC are entitled to summary judgment because they were not involved with the transactions in question. Defs.' Am. Mem. Supp. Summ. J. [D.E. 62] 10; see Fed. R. Civ. P. 56(c)(1)(B). "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." United States v. Bestfoods, 524 U.S. 51, 61 (1998) (quotation omitted); see Janus Capital Grp., Inc. v. First

10

Derivative Traders, 131 S. Ct. 2296, 2301–04 (2011) (holding that, where corporate formalities are observed, a corporate entity is not liable under SEC Rule 10b-5 for statements made by a related but legally separate entity); Vitol, S.A. v. Primerose Shipping Co., 708 F.3d 527, 543 (4th Cir. 2013) ("A corporate entity is liable for the acts of a separate, related entity only under extraordinary circumstances, commonly referred to as piercing the corporate veil." (quotation omitted)); De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69 (2d Cir. 1996) ("Indeed, ownership by a parent of all its subsidiary's stock has been held an insufficient reason in and of itself to disregard distinct corporate entities. Actual dominance, rather than opportunity to exercise control, must be shown." (quotation omitted)). Moreover, under North Carolina law, "a corporate parent cannot be held liable for the acts of its subsidiary unless the corporate structure is a sham and the subsidiary is nothing but a mere instrumentality of the parent." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 349 (4th Cir. 1998) (quotation omitted) (collecting cases); see, e.g., State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 362 N.C. 431, 438–39, 666 S.E.2d 107, 112–13 (2008); Glenn v. Wagner, 313 N.C. 450, 453–54, 329 S.E.2d 326, 330 (1985); Fischer Inv. Capital, Inc. v. Catawba Dev. Corp., 200 N.C. App. 644, 649–50, 689 S.E.2d 143, 147 (2009).

Plaintiffs alleged that UNIFI is the parent company of AHC, which in turn is the parent company of ALIC. Am. Compl. ¶¶ 4–5. They also alleged that "[a]t all relevant times, King was an agent and official representative for AIC, UNIFI, AHC and ALIC." Id. In their memorandum opposing summary judgment, plaintiffs fail to cite any evidence or make any argument to support these allegations concerning UNIFI or AHC. See Pls.' Mem. Opp'n Summ. J. [D.E. 59]. The record contains no evidence that UNIFI or AHC exercised actual control with respect to the transactions at issue or that ALIC or AIC were mere instrumentalities of UNIFI and AHC. Thus, the court grants defendants' motion for summary judgment on all remaining claims against defendants UNIFI and

AHC and dismisses UNIFI and AHC as defendants.

## B.

Plaintiffs' first two claims accuse AIC, ALIC, and King of committing securities fraud under federal law, 17 C.F.R. § 240.10b-5, and North Carolina law, N.C. Gen. Stat. § 78A-8(1)–(3). See Am. Compl. ¶¶ 64–81. Section 78A-8 "closely parallels the Rule 10b-5 antifraud provision of the Securities Exchange Act." State v. Davidson, 131 N.C. App. 276, 282, 506 S.E.2d 743, 748 (1998); see Teague v. Bakker, 35 F.3d 978, 991 (4th Cir. 1994). Accordingly, the court construes section 78A-8 in accordance with Rule 10b-5. See Teague, 35 F.3d at 991; Davidson, 131 N.C. App. at 282–83, 506 S.E.2d at 748; cf. Skinner v. E.F. Hutton & Co., Inc., 314 N.C. 267, 275, 333 S.E.2d 236, 241 (1985) (relying on Fourth Circuit precedent as guidance for construing a state law that was "identical" to a federal statute).[2]

To prevail on their securities-fraud claims, plaintiffs must show (1) a material misrepresentation or omission by defendants, (2) scienter, (3) a connection between the misrepresentation and the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. See, e.g., Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011); Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005). Defendants contend that plaintiffs have failed to raise a genuine issue of material fact concerning the first, second, fourth, and sixth elements. See Defs.' Am. Mem. Supp. Summ. J. 11–19.

First, defendants argue that they made no material misrepresentation. Id. A misrepresentation is material if "there is a substantial likelihood that the disclosure of the omitted

---

[2] In construing North Carolina law, the court must, absent "definitive authority from North Carolina's highest court, attempt to divine what that court would do were it faced with this [case]." Teague, 35 F.3d at 991. In doing so, the court may consider cases from the North Carolina Court of Appeals, treatises, and the practices of other states. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005).

fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Matrixx, 131 S. Ct. at 1318 (quotation omitted). Rule 10b-5 does not require that all material information be disclosed. Rather, "[d]isclosure is required . . . only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." Id. at 1321 (quotation and alteration omitted). Alleged misrepresentations and omissions must be considered in the full context in which they were made." Gasner v. Bd. of Supervisors, 103 F.3d 351, 358 (4th Cir. 1996).

This court limited plaintiffs' securities-fraud claims to King's alleged misrepresentations, made on or before Webster's October 15, 2008 purchase of the ALIC annuities, that the ALIC annuities would have a guaranteed annual return of 5%. See [D.E. 31] 7, 11. Although some evidence suggests that King orally misrepresented to Webster that the annuities would have a guaranteed annual return of 5%, see, e.g., Webster Dep. 88–89, 189; King Dep. 169–70; [D.E. 59-4] PW 614–15; [D.E. 59-5] Ameritas 627, defendants argue that the prepurchase written disclosure of the annuity terms to Huband and Wilson, Webster's CPA and attorney, negated any oral misrepresentation that King may have made. Defs.' Am. Mem. Supp. Summ. J. 13–14; see Gasner, 103 F.3d at 358 ("Cautionary language in an offering document may negate the materiality of an alleged misrepresentation or omission.").

Under North Carolina law, "[t]he general rule is that a principal is chargeable with, and bound by, the knowledge of or notice to his agent received while the agent is acting as such within the scope of his authority . . . although the agent does not in fact inform his principal thereof." Greensboro Hous. Auth. v. Kirkpatrick & Assocs., Inc., 56 N.C. App. 400, 403, 289 S.E.2d 115, 117 (1982) (quotation omitted); see also Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 494 (3d Cir. 2013) ("Although the Investors' underlying securities fraud claims are governed by federal law, the

13

issue of imputation is determined by state law."). Defendants assert that the underlining in the annuity brochure from Wilson's file shows that Wilson understood the terms of the annuity. Defs.' Am. Mem. Supp. Summ. J. 12; see [D.E. 51-2] Ameritas 252–61. Plaintiffs disagree and claim that the underlining was King's. See Wilson Dep. 18–20; Webster Dep. 190. Regardless of who underlined the brochure, Wilson and Huband possessed the annuity documents, including the GLWB rider brochure, before the October 2, 2008 meeting and had an opportunity to review them before Webster's October 15, 2008 purchase. See [D.E. 51-1] Ameritas 5, 64–161; [D.E. 51-2] Ameritas 193–279; Webster Dep. 179–80; Huband Dep. 101–02. Moreover, Huband and Wilson were acting as Webster's agents in vetting King and the proposed annuities. See, e.g., Webster Dep. 125, 131, 173, 276; [D.E. 51-1] Ameritas 27; [D.E. 51-2] Ameritas 170–71. As agents, their knowledge is imputed to Webster. See, e.g., Greensboro Hous. Auth., 56 N.C. App. at 403, 289 S.E.2d at 117.

Here, the court need not resolve the parties' dispute about the material-misrepresentation requirement. Cf. Matrixx, 131 S. Ct. at 1318–21; Gasner, 103 F.3d at 358. Instead, the court addresses the parties' arguments concerning scienter and reliance.

Defendants argue that, even when the evidence is viewed in the light most favorable to plaintiffs, the evidence does not support a finding of scienter. To prove scienter in a securities-fraud case, a plaintiff must show "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (quotation omitted). Either recklessness or intentional misconduct will suffice. Ottmann v. Hanger Orthopedic Grp., Inc., 353 F.3d 338, 343–44 (4th Cir. 2003); see Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 181 (4th Cir. 2009); Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 313 (4th Cir. 2009); Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 623 (4th Cir. 2008). Conduct is reckless when it is "so highly unreasonable and such an extreme departure from the

14

standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Ottmann, 353 F.3d at 343 (quotation omitted); Pub. Emps.' Ret., 551 F.3d at 313. "Mere negligence will not suffice." Ottman, 353 F.3d at 343.

Defendants argue that, had King intended to deceive Webster or acted recklessly, he would not have provided Webster's attorney and CPA with accurate documentation, see [D.E. 51-1] Ameritas 144–52; [D.E. 51-2] Ameritas 252–61,[3] and would not have provided Webster, Huband, and Wilson with contact information for two Ameritas employees who were "experts on the annuity" and were at "an arm's length" from the transaction in question. See [D.E. 51-14] PW 636. In response, plaintiffs cite three pieces of evidence concerning scienter: (1) the opinions of plaintiffs' expert, Dwight Carter; (2) King's alleged failure to respond to Ms. Webster's repeated inquiries in 2010 after she discovered "the truth" about the 5% guaranteed return; and, (3) King's pecuniary motive in selling the ALIC annuities. See Pls.' Mem. Opp'n Summ. J. 15–16.

Carter opines that King negligently interacted with Webster leading up to the purchase. See,

---

[3] The documents state:

Variable products are subject to investment risk, including possible loss of principal. Products underwritten by affiliate Ameritas Investment Corp. Before investing, carefully consider the investment objections, risks, charges and expenses, and other important information about the policy issuer and underlying investment options. This information can be found in the policy and investment option prospectuses. Prospectus are available online at variable.ameritas.com or you can obtain copies from us at 800-[XXX-XXXX]. Read the prospectuses carefully before investing.

[D.E. 51-1] Ameritas 72; see also id. at Ameritas 152 ("Guarantees . . . do not apply to the investment performance or account value of the underlying variable portfolios."); id. at Ameritas 81, 86, 101, 132, 140, 142. The GLWB brochure also stated that "[y]our policy value will not be affected by the Premium Accumulation Value," that the GLWB rider does not apply "to the investment performance or account value of the underlying variable portfolios," and that "[v]ariable annuities are suitable for long-term investing and are subject to investment risk, including possible loss of principal." See [D.E. 51-2] Ameritas 152, 256, 261.

15

Case 4:11-cv-00193-D   Document 86   Filed 09/30/14   Page 15 of 34

e.g., Ops. Dwight Carter [D.E. 59-14] 4–5 ("King was negligent in his failure to properly explain these benefits and the resulting cost. . . . King was negligent in failing to properly explain that the 5% was an income roll-up feature and not actual investment returns or interest on her money."). Negligence, however, "will not suffice" to prove scienter. Ottman, 353 F.3d at 343.

As for plaintiffs' suggestion that King failed to respond to Webster's requests for information in 2010, plaintiffs acknowledge that any avoidance occurred "after [Webster] discovered the truth about the 5% guaranteed return." Pls.' Mem. Opp'n Summ. J. 16 (emphasis added). King's alleged failure in 2010 to respond to Webster's 2010 communications does not suggest scienter in 2008 in light of King's numerous meetings and email exchanges with Webster before the October 15, 2008 purchase date, which is the relevant period for this claim. Cf. Segatt v. GSI Holding Corp., No. 07 Civ. 11413(WHP), 2008 WL 4865033, at *5 (S.D.N.Y. Nov. 3, 2008) (finding a plausible allegation of scienter where the defendants ignored plaintiff's emails and phone calls at the same time as the allegedly fraudulent conduct). Moreover, the record also shows numerous communications between King and Webster through July 27, 2010. See [D.E. 63-4] Ameritas 1637–58.

As for whether King had a pecuniary interest in selling the annuities to plaintiffs, he did based on the commission that he received for selling the annuities. See King Dep. 270. Pecuniary motive is a "relevant consideration" concerning scienter. Tellabs, Inc., 551 U.S. at 325. However, "[i]f simple allegations of pecuniary motive were enough to establish scienter, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1004–07 (9th Cir. 2009) (quotation omitted); see also Tellabs, 551 U.S. at 326 (the court must consider the record holistically). Thus, viewing the record historically, plaintiffs have failed to raise a genuine issue of material fact concerning scienter.

16

Alternatively, plaintiffs have failed to raise a genuine issue of material fact concerning reliance. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the [section] 10(b) private cause of action." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008). There must be a "requisite causal connection between a defendant's misrepresentation and a plaintiff's injury" before liability may arise. Id. (quotation omitted). "Reasonable reliance can only be found where a person has made reasonable inquiry." Colonial Lincoln-Mercury, Inc. v. Musgrave, 749 F.2d 1092, 1099 (4th Cir. 1984); see Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 208 (4th Cir. 1994) (requiring "justifiabl[e]" reliance on the misrepresentation).

The court must examine eight factors to determine whether reliance is reasonable when oral representations directly contradict later-received prepurchase written documentation:

(1) [t]he sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

Foremost Guar. Corp. v. Meritor Sav. Bank, 910 F.2d 118, 123–24 (4th Cir. 1990) (quotation omitted); see Poth v. Russey, 99 F. App'x 446, 453–55 (4th Cir. 2004) (per curiam) (unpublished) (applying the Foremost factors in securities matters); Myers v. Finkle, 950 F.2d 165, 167–69 (4th Cir. 1991) (applying the Foremost factors to a Rule 10b-5 action to determine whether investor reliance was reasonable). "Because no single factor is dispositive, consideration of all factors is necessary." Myers, 950 F.2d at 167. "[K]nowledge of information should be imputed to investors who fail to exercise caution when they have in their possession documents apprising them of the risks attendant to the investments." Id.

17

As for the first factor, plaintiffs' sophistication, relevant factors include wealth, age, education, professional status, and investment experience. Myers, 950 F.2d at 168. In October 2008, Webster was sixty-one years old, Pls.' Mem. Opp'n Summ. J. 8, had a Ph.D., Webster Dep. 12, and was a member of the Duke University medical faculty, a practicing psychologist, and a partner in a psychotherapy practice. See id. at 10–12. Moreover, in October 2008, Webster purchased over $1.5 million in ALIC annuities, King Dep. 270, shortly after losing between $600,000 and $800,000 with Fidelity. Webster Dep. 22–23. Webster's AIC account forms list her as having more than seven years of investment experience. See [D.E. 51-5] Ameritas 1700; King Dep. 293–94. Webster also had her tax attorney and her CPA assist her in the purchase process. Webster Dep. 125, 276. On this record, Webster was sophisticated. Compare Kennedy v. Josephthal & Co., Inc., 814 F.2d 798, 804–05 (1st Cir. 1987) (finding wealthy attorneys who invested $180,000 on a single investment to be sophisticated), with Myers, 950 F.2d at 168 (finding a genuine dispute about whether the plaintiffs were sophisticated because they "claim[ed] to be inexperienced in investment matters and to have been unfamiliar with tax shelters" while the defendants claimed only that the plaintiffs were wealthy and successful business owners). Thus, this factor weighs against plaintiffs.

As for the second factor, Webster and King did not have a long-standing business or personal relationship. Webster first met King in June 2008, King Dep. 166, and purchased the ALIC annuities four months later. See [D.E. 51-8] Ameritas 2849. Webster had not previously done business with King. See King Dep. 166, 169. Thus, this factor weighs against plaintiffs. See, e.g., Poth, 99 F. App'x at 455 (finding no long-standing business or personal relationships where the transaction in question was the first between the parties); Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1030 (4th Cir. 1997) (finding no long-standing business or personal relationship where the plaintiff purchased the securities in question two months after first contact with the defendants, and

18

the plaintiff consulted with third parties and rejected most of the defendant's recommendations).

As for the third factor, access to relevant information, Webster or her agents had access to written documentation containing the annuity terms before the second meeting and before Webster's October 15, 2008 purchase of the annuities. See [D.E. 51-1] Ameritas 5, 64–161; [D.E. 51-2] Ameritas 193–279; Webster Dep. 179–80; Huband Dep. 101–02. Thus, this factor weighs against plaintiffs.

As for the fourth factor, whether a fiduciary relationship existed between King and Webster, under North Carolina law, a fiduciary relationship exists where

> there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence, and it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.

Dalton v. Camp, 353 N.C. 647, 651, 548 S.E.2d 704, 707–08 (2001) (quotation, alteration, and emphasis omitted). "Generally, in North Carolina, there are two types of fiduciary relationships: (1) those that arise from legal relations such as attorney and client, broker and client . . . and (2) those that exist as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other." S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008) (quotation and alteration omitted).

An investment advisor–client relationship is not a de jure fiduciary relationship. Silverdeer, LLC v. Berton, No. 11 CVS 3539, 2013 WL 1792524, at *9 (N.C. Super. Ct. Apr. 24, 2013); accord Harrold v. Dowd, 149 N.C. App. 777, 784, 561 S.E.2d 914, 919 (2002) (holding that there is not a de jure fiduciary relationship between an accountant and client). "Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the 'special circumstance' of a [de facto] fiduciary relationship has

19

arisen." Broussard, 155 F.3d at 348. In assessing whether a de facto fiduciary relationship exists, a court must look to the "particular facts and circumstances of a given case." Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A., 730 S.E.2d 763, 767 (N.C. Ct. App. 2012); see Dallaire v. Bank of Am., N.A., 760 S.E.2d 263, 267 (N.C. 2014) (stating that "a fiduciary relationship may exist under a variety of circumstances" (quotation omitted)). Parties who interact at arms-length typically do not have a fiduciary relationship with each other. Crumley, 730 S.E.2d at 767.

Webster and King discussed the purchase of the ALIC annuities at arms-length. Webster relied on her own "team" of experts, Wilson and Huband. See [D.E. 51-1] Ameritas 33–34; [D.E. 59-4] PW 614–15; [D.E. 59-5] Ameritas 627; Webster Dep. 125. Webster declined to purchase life insurance from King, even though he offered it. See Webster Dep. 89; [D.E. 51-1] Ameritas 27, 31, 34; [D.E. 51-5, 51-8]. Webster's correspondence with King before purchasing the annuities on October 15, 2008, does not reflect a relationship where King held "domination and influence." See, e.g., [D.E. 59-4] PW 614 (Webster suggesting to King what he should discuss at their meeting and telling him that "I will start off the meeting by giving a brief background about why I'm thinking about this move"); [D.E. 59-5] Ameritas 627 (Webster telling King to "[f]ocus . . . on your original plan for my portfolio . . . focus on if we go with the annuity alone, why I will be better off . . . BE PREPARED TO BACK UP YOUR CLAIMS WITH WRITTEN MATERIAL. . . . I feel like you are already a member of my team. Step up to that."). Webster took an independent, analytical, reasoned approach in choosing to work with King to maximize her investment returns and maintain her principal. See, e.g., [D.E. 51-10] Ameritas 3929. While Webster ultimately may have reposed confidence in King's opinions, see Webster Dep. 56, King did not exercise domination and influence over her to the extent of creating a de facto fiduciary relationship. See, e.g., Broussard, 155 F.3d at 348; Charlotte-Mecklenburg Hosp. Auth. v. Wachovia Bank, N.A., 2009 NCBC LEXIS 33, at *9–10

20

(N.C. Super. Ct. Oct. 6, 2009).

In response, plaintiffs make two arguments. First, they cite Phillips v. State Farm Mutual Automobile Insurance Company, 129 N.C. App. 111, 497 S.E.2d 325 (1998), for the proposition that King was a fiduciary because he sold life insurance. Pls.' Mem. Opp'n Summ. J. 23. In Phillips, however, the court limited the extent of an insurance agent's fiduciary duty to "procuring insurance for an insured, correctly naming the insured in the policy, and correctly advising the insured about the nature and extent of his coverage." Phillips, 129 N.C. App. at 113, 497 S.E.2d at 327. Unlike the defendant in Phillips, King was not Webster's insurance agent. Rather, King was licensed to sell life insurance policies and discussed them with Webster, but Webster never bought life insurance from King. Thus, the limited fiduciary duties of Phillips never arose. See Time Warner Ent.-Advance Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314–15 (4th Cir. 2007); Broussard, 155 F.3d at 348 ("[A]s a federal court exercising concurrent jurisdiction over this important question of state law we are most unwilling to extend North Carolina tort law farther than any North Carolina court has been willing to go.").

Second, plaintiffs argue that whether a fiduciary relationship existed is a question of fact for the jury. This argument fails. See, e.g., Broussard, 155 F.3d at 348; Crumley, 730 S.E.2d at 767; Tin Originals, Inc. v. Colonial Tin Works, Inc., 98 N.C. App. 663, 666, 391 S.E.2d 831, 833 (1990); Stone v. McClam, 42 N.C. App. 393, 400–01, 257 S.E.2d 78, 83 (1979).

King and plaintiffs did not have a fiduciary relationship. Thus, the fourth factor weighs against plaintiffs.

As for the fifth factor, concealment of the fraud, King did not take measures to conceal the alleged fraudulent statements. On the contrary, well before the October 15, 2008 purchase, King provided written documentation to Huband and Wilson that included the specific terms of the

21

GLWB rider, see [D.E. 51-1] Ameritas 5, 64–161; [D.E. 51-2] Ameritas 193–279, and on September 21, 2008, he provided Webster, Huband, and Wilson with the names and telephone numbers of two Ameritas employees who could explain the annuity. See [D.E. 51-14] PW 636. Thus, the fifth factor weighs against plaintiffs.

As for the sixth factor, opportunity to detect the fraud, Webster, Huband, and Wilson possessed the accurate, written GLWB documentation well before plaintiffs purchased the ALIC annuities on October 15, 2008. Webster Dep. 179–80; Huband Dep. 101–02. Moreover, on September 21, 2008, King provided Webster, Huband, and Wilson with the contact information of two other Ameritas employees who could have explained the ALIC annuities to them in full. See [D.E. 51-14] PW 636. Thus, the sixth factor weighs against plaintiffs.

As for the seventh factor, whether the plaintiff initiated the stock transaction or sought to expedite the transaction, Webster initiated the transaction by approaching King "about doing some business." Webster Dep. 71–72. Thus, the seventh factor weighs against plaintiffs.

As for the eighth factor, the generality or specificity of the misrepresentations, plaintiffs argue that King misrepresented the specific nature of the alleged 5% return. See Banca Cremi, S.A., 132 F.3d at 1030–31 (analyzing this factor and holding that "a general statement creates less justifiable reliance than would a specific statement") (emphasis in original). Viewing the evidence in the light most favorable to plaintiffs, this factor weighs for plaintiffs.

Considering all eight factors, seven factors favor defendants and one factor favors plaintiffs. Consequently, the balance weighs heavily in defendants' favor, and plaintiffs fail to raise a genuine issue of material fact concerning whether they reasonably relied on King's oral statements in the face of the entire record. See Poth, 99 F. App'x at 455 (holding that plaintiffs failed to raise a material issue of fact on the issue of reasonable reliance when six of the eight factors favored the defendants).

22

Accordingly, the court grants defendants' motion for summary judgment on claims one and two.[4]

C.

Plaintiffs' third claim alleges a violation of N.C. Gen. Stat. §§ 78C-8(a) and (b) in the North

Carolina Investment Advisers Act ("NCIAA"). Am. Compl. ¶¶ 82–91. The pertinent sections state:

> (a) It is unlawful for any person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise,
> (1) To employ any device, scheme, or artifice to defraud the other person, [or]
> (2) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person . . . .
>
> (b) In the solicitation of advisory clients, it is unlawful for any person to make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

N.C. Gen. Stat. §§ 78C-8(a), (b). Absent controlling authority from the North Carolina Supreme

Court, this court interprets the statutory language and predicts how that court would rule if presented

with the issue. See, e.g., Ellis v. Grant Thornton LLP, 530 F.3d 280, 287 (4th Cir. 2008); Twin City

Fire Ins. Co., 433 F.3d at 369; Castillo v. Emergency Med. Assocs., P.A., 372 F.3d 643, 648 (4th Cir.

2004).

Initially, defendants argue that "[i]n order to be covered by the NCIAA, one must be an

'investment adviser.'" Defs.' Am. Mem. Supp. Summ. J. 19. However, sections 78C-8(a) and (b)

---

[4] The court rejects plaintiffs' argument that Stoneridge, 552 U.S. at 159, compels a rebuttable presumption of reliance. In Stoneridge, the Court reasoned that a rebuttable presumption of reliance arises under two circumstances: (1) if there is an omission of a material fact where a duty to disclose existed; or (2) under the fraud-on-the-market doctrine. Id. (emphasis added). The presumption of reliance for an omission recognizes that it is difficult for the defrauded investor to prove she relied on the absence of the material fact when she purchased or sold a security. Here, however, plaintiffs' argument is not that King omitted information. Rather, plaintiffs contend that he affirmatively misled Webster by orally misrepresenting the nature of the GLWB rider. Because plaintiffs' core argument concerns an alleged misrepresentation and not an omission, Stoneridge does not help plaintiffs.

apply to "any person." N.C. Gen. Stat. § 78C-8(a), (b) (emphasis added). The North Carolina General Assembly defined "person" separately from "investment adviser." N.C. Gen. Stat. §§ 78C-2(1), (5). Moreover, within section 78C-8, the General Assembly uses the two terms in separate provisions. Compare N.C. Gen. Stat. § 78C-8(a), with N.C. Gen. Stat. § 78C-8(c). Thus, the court rejects defendants' argument that one must be an investment adviser to be covered by the NCIAA. See Szulik v. Tagliaferri, 966 F. Supp. 2d 339, 369 (S.D.N.Y. 2013) ("Although the term 'Investment Adviser' does not include investment advisers 'covered under federal law,' the anti-fraud provision of the NCIAA applies to any 'person,' a separately defined term.").

Section 78C-8(a) creates two antecedent conditions before a person may be liable under 78C-8(a)(1) or 78C-8(a)(2). First, the person must receive, directly or indirectly, consideration from another person. N.C. Gen. Stat. § 78C-8(a). Second, that consideration must result from the person "advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise." Id.

In State v. Clemmons, 111 N.C. App. 569, 576, 433 S.E.2d 748, 752 (1993), the North Carolina Court of Appeals held that a 10% commission on the sale of corporate securities was sufficient consideration under section 78C-8(a). Here, King received a commission for the sale of the ALIC annuities. King Dep. 270. King's commission, however, was not for advising Webster "as to the value of securities or their purchase or sale." N.C. Gen. Stat. § 78C-8(a). Rather, it was a 7.5% commission on the sale of an annuity product, independent of whatever security Webster might purchase. See King Dep. 270; [D.E. 51-8] Ameritas 2847. The NCIAA explicitly excludes a variable annuity from the definition of a security. N.C. Gen. Stat. § 78A-2(11); see id. § 78C-2 ("the definitions of [N.C. Gen. Stat. §] 78A-2 shall apply"). Unlike the defendant in Clemmons, King did not receive the commission because of advice on which securities to purchase. Moreover,

although King later offered investment advice to Webster and hoped that she would expand the relationship, the consideration he received for selling the annuities in October 2008 was not directly or indirectly related to such advice. Thus, plaintiffs' claim under sections 78C-8(a) fails.

Alternatively, plaintiffs' section 78C-8(a) claim fails because King's alleged oral misrepresentations do not, as a matter of law, violate 78C-8(a)(1) or (2). Absent a definitive ruling from the North Carolina Supreme Court, this court interprets these sections in accordance with its construction of section 78A-8(1) and (3), which are identical to 78C-8(a)(1) and (2), and therefore in accordance with Rule 10b-5(a) and (c). See Teague, 35 F.3d at 991; Davidson, 131 N.C. App. at 282, 506 S.E.2d at 748; N.C. Gen. Stat. §§ 78A-8, 78C-8(a); 17 C.F.R. 240.10b-5(a), (c). Although the Fourth Circuit has not ruled on this specific question, other federal courts consistently have held that so-called "scheme liability" under Rule 10b-5(a) and (c) cannot be premised on alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim. See, e.g., WPP Luxembourg Gamma Three v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005); Pub. Pension Fund Grp. v. KV Pharm. Co., 679 F.3d 972, 987 (8th Cir. 2012). There must be "performance of an inherently deceptive act that is distinct from an alleged misstatement." SEC v. Kelly, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011). Examples of inherently deceptive conduct include illegal late trading, structuring round-trip transactions and fabricating documents to create illusory revenue, and securitizing worthless invoices. SEC v. Lucent Techs., Inc., 610 F. Supp. 2d 342, 360 (D.N.J. 2009). Plaintiffs have not alleged, and the record does not show, any inherently deceptive act on the part of defendants that is distinct from the alleged oral misrepresentations. Thus, plaintiffs' claim under section 78C-8(a) fails

even if the variable annuity is a security.[5]

As for section 78C-8(b), the statute applies to statements made "[i]n the solicitation of advisory clients." N.C. Gen. Stat. § 78C-8(b). Viewing the evidence in the light most favorable to plaintiffs, King gave investment advice to Webster concerning the annuities in the hopes of receiving a fee should Webster be happy with the advice. See Webster Dep. 172, 413. Before Webster purchased the annuities in October 2008, King explained to her his method of predicting the market trajectory. King Dep. 182. King also continued to provide investment advice to Webster after she purchased the annuities in October 2008 and hoped to expand the relationship and receive a future fee. See, e.g., [D.E. 59-19] PW 745; [D.E. 63-15] Ameritas 674. Thus, the court assumes without deciding that King's conduct was done "in the solicitation" of Webster as an advisory client and that section 78C-8(b) applies to him.

Section 78C-8(b) makes it "unlawful for any person to make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." N.C. Gen. Stat. § 78C-8(b). Apart from the antecedent condition, section 78C-8(b) is identical to section 78A-8(2). Compare N.C. Gen. Stat. § 78C-8(b), with N.C. Gen. Stat. § 78A-8(2). As discussed, North Carolina courts interpret section 78A-8 in light of Rule 10b-5 and its attendant case law. See Davidson, 131 N.C. App. at 282, 506 S.E.2d at 748. Thus, this court construes the main clause of section 78C-8(b), defining the underlying illegal conduct, in accordance with its construction of section 78A-8 and, therefore, Rule 10b-5. See Teague, 35 F.3d at 991; cf. Skinner, 314 N.C. at 275, 333 S.E.2d at 241.

---

[5] Alternatively, claims under Rule 10b-5(a) and (c) are subject to proving scienter and reasonable reliance. Matrixx, 131 S. Ct. at 1317. Here, plaintiffs' claim under section 78C-8(a) also fails due to a lack of scienter and reasonable reliance. Thus, plaintiffs' claim under section 78C-8(a) fails for three independent reasons.

26

Accordingly, just as plaintiffs' North Carolina securities-fraud claim fails in count two, plaintiffs' claim under section 78C-8(b) also fails, and the court grants defendants' motion for summary judgment on claim three.

## D.

Plaintiffs' fourth claim alleges a violation of the Investment Advisers Act ("IAA"), 15 U.S.C. § 80b-6. Am. Compl. ¶¶ 92–98. To establish a claim under section 80b-6, plaintiffs must prove that defendants (1) were investment advisors; (2) engaged in fraudulent activities; and (3) negligently breached their fiduciary duty by making false and misleading statements or omissions of material fact. SEC v. Gotchey, 981 F.2d 1251, 1992 WL 385284, at *2 (4th Cir. 1992) (per curiam) (unpublished table decision) (citing SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 192–95 (1963)). The IAA defines an investment advisor as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities," and specifically excludes "any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor." 15 U.S.C. § 80b-2(a)(11).

"[T]he [IAA's] broker–dealer exemption[] exempts brokers and dealers who give investment advice so long as (1) the advice is solely incidental to their conduct as brokers or dealers, and (2) they receive no special compensation for that advice." Thomas v. Metro. Life Ins. Co., 631 F.3d 1153, 1160 (10th Cir. 2011). "[B]roker–dealers meet the first prong of the exemption so long as they give investment advice only in connection with the primary business of selling securities," but not if they "give advice that is not connected to the sale of securities" or if their "primary business consists of giving advice." Id. at 1164. As for the second prong, "'special compensation' refers to

27

economic benefit that is received specifically for investment advice, in a form other than a commission for the sale of the underlying product." Id. at 1165; see SEC v. Nat'l Exec. Planners, Ltd., 503 F. Supp. 1066, 1074 (M.D.N.C. 1980).

King's investment advice was incidental to the sale of annuities to Webster. Although King promoted his financial-planning experience to Webster, see King Dep. 168–69, King received no compensation for any investment advice he gave to Webster. His only compensation was his commission on the sale of the ALIC annuities, an investment and tax-deferral product. King Dep. 270. Thus, King gave advice solely incidental to his conduct as a broker or dealer and received no "special compensation" for investment advice. See Thomas, 631 F.3d at 1164–68; Nat'l Exec. Planners, Ltd., 503 F. Supp. at 1074. Likewise, although King hoped to expand the relationship and to be compensated for his investment advice in the future, see Webster Dep. 413, the mere possibility of future compensation, contingent on the client's future satisfaction, does not constitute "for compensation" under the IAA. See 15 U.S.C. 80b-2(a)(11) (defining an investment advisor as "any person who, for compensation, engages in the business of advising others . . .") (emphasis added). Accordingly, King and the remaining defendants were not investment advisors under the IAA, and plaintiffs' claim under section 80b-6 fails. The court grants defendants' motion for summary judgment on claim four.

E.

Plaintiffs' seventh claim alleges a breach of fiduciary duty. See Am. Compl. ¶¶ 113–17. As explained above, King and plaintiffs did not have a fiduciary relationship when plaintiffs purchased the ALIC annuities, and no material changes occurred after the purchase that created a fiduciary relationship. See, e.g., Silverdeer, 2013 WL 1792524, at *9. Accordingly, the court grants defendants' motion for summary judgment on claim seven.

F.

In claims eight and nine, plaintiffs allege that defendants committed fraud (claim eight) and fraud in the inducement (claim nine). Am. Compl. ¶¶ 118–34. To prove either claim, a plaintiff must show: "(1) [f]alse representation or concealment of a past or existing material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Whisnant v. Carolina Farm Credit, 204 N.C. App. 84, 94–95, 693 S.E.2d 149, 156–57 (2010) (quotations omitted); see Phelps-Dickson Builders, LLC v. Amerimann Partners, 172 N.C. App. 427, 437, 617 S.E.2d 664, 670 (2005) (fraud); Harton v. Harton, 81 N.C. App. 295, 298–99, 344 S.E.2d 117, 119–20 (1986) (fraud in the inducement). In addition, the injured party's reliance must be reasonable. See Hudson-Cole Dev. Corp. v. Beemer, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999); Rosenthal v. Perkins, 42 N.C. App. 449, 451–52, 257 S.E.2d 63, 65 (1979).

Defendants contend that plaintiffs' reliance on the alleged misrepresentation was not reasonable. Defs.' Am. Mem. Supp. Summ. J. 26. A plaintiff's reliance is unreasonable when the plaintiff "could have discovered the truth upon inquiry" unless "[s]he was denied the opportunity to investigate or . . . could not have learned the true facts by exercise of reasonable diligence." Hudson-Cole, 132 N.C. App. at 346, 511 S.E.2d at 313; see also Cobb v. Pa. Life Ins. Co., 215 N.C. App. 268, 276, 715 S.E.2d 541, 549 (2011) (holding that reliance on oral misrepresentations about an insurance policy was unreasonable where the plaintiff received the written policy after the alleged oral misrepresentation and before purchasing it and had thirty days to review it and the policy terms were "unambiguously expressed in the policy, which [plaintiff] had a duty to read"); Kucmierz v. Four Oaks Bank & Trust Co., 202 N.C. App. 148, 690 S.E.2d 559, 2010 WL 157550, at *3 (2010) (unpublished table decision). On the other hand, "[t]he law does not require a prudent [wo]man to

29

deal with everyone as a rascal, and demand covenants to guard against the falsehood of every representation which may be made." Johnson v. Owens, 263 N.C. 754, 758, 140 S.E.2d 311, 314 (1965) (quotation omitted); see also Phelps-Dickson Builders L.L.C., 172 N.C. App. at 438, 617 S.E.2d at 671 ("in close cases, sellers intentionally and falsely representing material facts so as to induce a party to action should not be permitted to say in effect, 'You ought not to have trusted me. If you had not been so gullible, ignorant, or negligent, I could not have deceived you.'" (quotation omitted)). A plaintiff's reliance on a misrepresentation is more likely to be reasonable if the plaintiff had only "some lesser opportunity to investigate the . . . misrepresentations," and if the defendant's representations "could not be readily or easily verified." Phelps-Dickson Builders, 172 N.C. App. at 439, 617 S.E.2d at 671.

This is not a "close case." Id. at 438, 617 S.E.2d at 671. Well before plaintiffs purchased the annuities, King delivered to Huband and Wilson documents containing, among other items, accurate information on the GLWB rider and its precise terms. See [D.E. 51-1] Ameritas 5, 64–161; [D.E. 51-2] Ameritas 193–279; Webster Dep. 179–80; Huband Dep. 101–02.[6] Had any of the three of them read the GLWB brochure, they would have discovered, for example, that the 5% return did not apply to the value of the underlying investment portfolio, and thereby "readily or easily verified" King's representations. Phelps-Dickson Builders, 172 N.C. App. at 439, 617 S.E.2d at 671; see [D.E. 51-1] Ameritas 152. In addition, Huband put Webster on notice on September 18, 2008, to investigate King's claims further when Huband told Webster that there was a commission on the annuities, contrary to King's claim, and warned Webster that "no one can guarantee you a twelve percent return. You just can't do that." Huband Dep. 43; [D.E. 51-1] Ameritas 27. Moreover, on

---

[6] Again, the court notes that Huband's and Wilson's knowledge is imputed to Webster because they acted as Webster's agents before her purchase of the ALIC annuities. See Greensboro Hous. Auth., 56 N.C. App. at 403, 289 S.E.2d at 117.

September 21, 2008, King also provided Webster, Huband, and Wilson the contact information for two Ameritas employees who he claimed were experts on the annuity product and could answer any questions. See [D.E. 51-14] PW 636.[7] Accordingly, if plaintiffs relied on any oral misrepresentation King may have made before purchasing the annuities, that reliance was unreasonable. Accordingly, the court grants defendants' motion for summary judgment on claims eight and nine.

G.

Plaintiffs' tenth claim alleges negligence on the part of King and the other defendants before and after Webster's purchase of the ALIC annuities. Am. Compl. ¶¶ 135–44. To prove negligence, a plaintiff must show "(1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." Bridges v. Parrish, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013) (quotation omitted). Defendants argue that King had no duty to advise Webster after her purchase of the annuities. They also argue that there was no breach of duty in the purchase of the annuities, and that defendants' actions were not a proximate cause of plaintiffs' injuries. See Defs.' Am. Mem. Supp. Summ. J. 28–29.

The court assumes without deciding that defendants owed a duty to plaintiffs.[8] As for the second element of a negligence claim, a breach of a legal duty, the court considers two factors concerning plaintiffs' claims that defendants negligently misrepresented the terms of the annuities

---

[7] The prepurchase documentation states that a customer must activate and pay for the GLWB rider to receive its benefits, [D.E. 51-1] Ameritas 145–47, yet Webster did not activate the GLWB rider. Webster, however, did purchase a guaranteed death benefit. See [D.E. 51-8] Ameritas 2846. Furthermore, no later than October 13, 2009, ALIC notified Webster that the GLWB rider was inactive on her policy. See [D.E. 51-7] Ameritas 1820. Webster acknowledged that she received but did not read this notice. Webster Dep. 350.

[8] See Bridges v. Parrish, 731 S.E.2d 262, 265 (N.C. Ct. App. 2012), aff'd, 366 N.C. 539, 742 S.E.2d 794 (2013); Stein v. Asheville City Bd. of Educ., 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006).

before the purchase: (1) whether defendants knew that plaintiffs would rely on the misrepresentation; and (2) whether plaintiffs justifiably relied on the misrepresentation. Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP, 350 N.C. 214, 219, 513 S.E.2d 320, 324 (1999); see Howell v. Fisher, 49 N.C. App. 488, 494–98, 272 S.E.2d 19, 24–26 (1980); Associated Packaging, Inc. v. Jackson Paper Mfg. Co., No. 10 CVS 745, 2012 WL 707038, at *14–15 (N.C. Super. Ct. Mar. 1, 2012). The "question of justifiable reliance is analogous to that of reasonable reliance in fraud actions." Marcus Bros. Textiles, 350 N.C. at 224, 513 S.E.2d at 327 (quotation omitted). As explained above, plaintiffs' reliance on King's alleged oral misrepresentations was not reasonable. Thus, plaintiffs' negligence claim concerning King's alleged oral misrepresentations on or before the purchase of the ALIC annuities fails. See, e.g., MacFadden v. Louf, 182 N.C. App. 745, 749, 643 S.E.2d 432, 435 (2007).

To the extent that plaintiffs allege negligence after the October 2008 purchase, their vague allegations do not create a factual dispute for a jury. Plaintiffs claim that "[d]efendants damaged [p]laintiffs . . . by negligently misleading Ms. Webster to enter into ruinous and unsuitable financial investments, and by negligently managing and directing the assets of [p]laintiffs . . . ." Pls.' Mem. Opp'n Defs.' Mot. Summ. J. 30. The record, however, belies these assertions. First, Webster had sole control over the accounts. Webster Dep. 306–07; King Dep. 294–95; [D.E. 51-8] Ameritas 2848. Second, King mistakenly put Webster's money into an aggressive fund when she opened the account in October 2008, but when she discovered this error three months later the "mistake" had yielded a 12% return. See [D.E. 51-15] PW 802–03; cf. Webster Dep. 350. Third, had Webster stayed in the aggressive fund, her annual return through 2013 would have been between 7.62% and

32

14.2%, a higher return than the alleged 5% guaranteed return. See [D.E. 63-17] Ameritas 3940.[9]

Fourth, after discovering King's mistaken allocation of her money in January 2009, Webster chose to remain in the aggressive fund until March 2009 when she moved her funds into a money market fund and left them there through 2010. See [D.E. 59-18] PW 744; [D.E. 51-15] PW 802–03. Webster stayed in the money market fund despite King's April 20, 2009 advice, in response to her April 10, 2009 query, to reenter the stock market in May 2009. [D.E. 63-15] Ameritas 674; [D.E. 59-8] Ameritas 673. Webster claimed that she did not reenter the stock market because King did not use the magic words "pull the trigger," but she acknowledged that "I think [King] was telling me what to do, or suggesting." Webster Dep. 372. Moreover, by October 13, 2009, Ameritas had informed Webster that her GLWB rider was inactive, but she took no investigative action until she called Ameritas in March or April 2010. See [D.E. 51-7] Ameritas 1820; [D.E. 59-13] Ameritas 2667; [D.E. 51-15] PW 801. In light of the evidence that defendants' actions did not proximately cause any injury to plaintiffs, Defs.' Reply Supp. Mot. Summ. J. [D.E. 63] 5–6, plaintiffs fail to show specific facts demonstrating a genuine issue for trial concerning their allegations of postpurchase negligence. Furthermore, the court "is not required to scour the record in search of evidence to defeat a motion for summary judgment." Ritchie v. Glidden Co., 242 F.3d 713, 723 (7th Cir. 2001) (quotation omitted); Muhammad v. Giant Food Inc., 108 F. App'x 757, 764 (4th Cir. 2004) (quoting Ritchie approvingly).[10]

---

[9] Defendants assert that had Webster stayed in the aggressive fund, her investment now would be worth approximately $3 million. Defs.' Am. Mem. Supp. Summ. J. 9.

[10] The court has also considered the relevant factual allegations made in the verified amended complaint. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); cf. Spencer v. Hutchens, 471 F. Supp. 2d 548, 552 (M.D.N.C. 2006) (collecting cases and reasoning that the court need not accept general factual statements in the verified complaint that are contradicted by specific evidence in the record).

33

In sum, plaintiffs did not justifiably rely on defendants' alleged negligent misrepresentations before purchasing the ALIC annuities, and plaintiffs have not demonstrated a genuine issue for trial concerning any alleged postpurchase negligence. Accordingly, the court grants defendants' motion for summary judgment on claim ten.

H.

Plaintiffs' eleventh claim asserts that AIC and ALIC are liable for King's allegedly negligent conduct based on the doctrine of respondeat superior. Am. Compl. ¶¶ 145–51. "Respondeat superior is a doctrine which makes a principal liable for the acts of an agent within the scope of the agent's authority." Blanton v. Moses H. Cone Mem'l Hosp., Inc., 319 N.C. 372, 374–75, 354 S.E.2d 455, 457 (1987). Because plaintiffs' claims against King fail as a matter of law, AIC and ALIC are not liable to Webster under respondeat superior for King's actions. Accordingly, the court grants defendants' motion for summary judgment on claim eleven.

V.

In sum, the court GRANTS summary judgment to defendants UNIFI and AHC and DISMISSES them as defendants. The court GRANTS summary judgment for the remaining defendants on all claims [D.E. 51]. The court GRANTS defendants' motion to strike plaintiffs' errata sheet [D.E. 60]. In light of the disposition of the motion for summary judgment, the court DISMISSES as moot the parties' pending motions to strike expert testimony and defendants' motion to compel [D.E. 64, 66, 74]. The clerk shall close the case.

SO ORDERED. This **30** day of September 2014.

JAMES C. DEVER III
Chief United States District Judge